and we'll hear argument next in Jennings v. City of New York 19-4281 and 19-4370. Mr. Townsend. Thank you, Judge Lohier. Good morning, Your Honors. Jesse Townsend for the Appellant's Cross Appellees. Your Honors, this court is charged with reviewing punitive damage awards to ensure that they are reasonable, predictable, proportionate, and constitutional. The $355,000 in punitive damages awarded after the second trial in this case are none of those things, and the District Court erred in not remitting those awards for two independent reasons. First, the District Court erred by not comparing the second jury's damages to this court's prior decisions concerning punitive damage awards and other officer misconduct cases, such as Payne v. Jones and DeSorbo v. Oye. These decisions demonstrate that even when officers are found liable for misconduct, and DeSorbo explicitly addressed what it called disturbing allegations of police brutality, this court still analyzed the magnitude of the punitive damages awarded under the Supreme Court's Gore Guideposts and by comparison to similar cases. And those cases were factually similar to this case in terms of the amount and duration of the force used. And those decisions' Gore analysis applies to this case as well. The cases present broadly similar reprehensibility facts going to the first Gore Guidepost, and those cases cited the same New York criminal statute, misdemeanor assault, that would be applicable here. And after that Gore analysis and comparison to other cases, those two decisions order the remitted or punitive damages to a range of between 103,000 to 110,000 in 2019 values, which are far smaller, obviously, than the $355,000 in damages that the And based on the similarity between this case and those prior decisions of this court, the district court should have ordered the punitive damages remitted. Now, for all those reasons just outlined, the district court's remitted or decision after the first trial was appropriate. And on appeal, plaintiff concedes that remitted of the first verdict was appropriate, but it's just challenging the amount. But in that order after the first decision, after the first jury verdict, the court considered the Gore Guideposts, it compared the case before it to DeSorbo and Payne, and it considered the evidence of the excessive force claim and made a careful decision on the appropriate amount of punitive damages. And there's really no reason to disturb that order. Now, given that careful analysis after the first trial, it was perplexing that the court did not adhere to its decision after the second trial, which led to its second error. This court was quite clear in Earl v. Beauchamp Transportation that a remitted or sets the maximum amount of damages that a court believes is not excessive. And it signals to the plaintiff the maximum award that a court would permit any jury to return. And the district court ignored those core principles. It also ignored its prior decision, its prior order's status of law of the case, which is something that plaintiff does not contest. As law of the case, it could be revisited only on proper grounds, such as new evidence or a change in controlling law. The district court identified neither grounds for revisiting its prior determination. Instead, it's stated reasoning for not applying its prior... The district court did say that, you know, damages awards are approximations and they're not fixed. And so we shouldn't treat it as a strict cap. I mean, why isn't that enough of a rationale for the district court to depart from treating the first award as a strict, or the first remitted or as a strict cap? Because, Judge Monashi, by saying that, the district court was violating Beauchamp. Because what Beauchamp said was that in setting a remitted or amount, the court has to decide the maximum reasonable award that is permissible. And by then going on to say, as the district court did in this case, well, the punitive damages awarded at the second jury were closer to the maximum reasonable award, the district court violated Beauchamp. And it also violated this court's... If the district court were bound to treat the first decision as a strict cap, would it have been appropriate to tell the jury that it can't award punitive damages over $140,000 at the outset? Would that have been an appropriate jury instruction if that's the law of the case that controls the outcome here? So I know this court disfavors instructing juries on specific dollar amounts. And I don't think the court needed to do that here either, because there can be grounds to depart from law of the case when there is new evidence. So theoretically, if a plaintiff after remitted her decision in the second trial comes forward with newly elicited examination, that leads to a new line of questioning of a witness, leading to testimony the first jury didn't hear, or potentially chooses to call a different witness, or in an extreme case, perhaps even reopens discovery between the first and second trial so that there's new evidence to present, the district court could take that into account and rule... But was the second trial only on damages? There wasn't going to be new evidence of the underlying conduct, was there, going to be? That's right, Your Honor. The trial needed to be... So that wouldn't have been possible, right? So then why didn't you ask for a jury instruction that they can't go beyond the cap that the court had set in the first proceeding? Well, Your Honor, I don't think, just because the trial was just on damages, that it's not possible that the testimony could have led to a different punitive damages award, depending on... What could have happened in the second proceeding that would, that in your view, would have allowed the district court to depart from the cap it had set in the first? Sure, Your Honor. One hypothetical might be if the evidence of injury were more severe, that potentially could factor in, certainly into compensatory, but potentially in the punitive as well. If there were clear testimony about, for example, if the plaintiff testified that he had been handcuffed when the event happened, as in some cases, being handcuffed during an act of excessive force is considered an aggravating factor. So there are things that certainly could have been elicited that could have led to the court deciding that its prior decision was no longer valid in light of this new evidence. Okay, well, can I ask, so if the compensatory damages were lower in the second trial than what the district court said was reasonable in the first trial, does that have an effect on what is a reasonable award of punitive damages? Because the overall mix might be approximate the right amount or the maximum amount. Both should be treated as a cap. Both are treated as a cap. That's right, Your Honor, because the court independently considered the appropriate compensatory award or the maximum compensatory award that was permissible and the maximum punitive award that was permissible or punitive awards that were permissible. And again, without identifying specific evidence that justifies departing from its prior decision on either of those awards, it was inappropriate to not return to the first remandatory decision. And I would just note... Let me add... I'm sorry. Go ahead. If I could just finish very quickly on that point. I just want to note that the district court explicitly said that the evidence between the two trials was the same or similar. And so the district court did not identify additional evidence that would factor into a reason to Yeah. Let's assume hypothetically that there had been no first trial. And in the only trial in this case, the jury awarded the damages that it did in the second trial. Would it be the city's position that these damages were too high? Yes, Your Honor. That would be a straight Gore analysis, if you will. And... Well, wouldn't you agree... Would you agree or disagree that the conduct of the police officers in this case was unusually reprehensible? I think it is. What the jury found is certainly described as reprehensible. That's true of any excessive force case, Your Honor. And when this court... This court has considered other... I still want to ask you. I ask you, would you agree with the proposition that the conduct of the police officers in this case was unusually reprehensible? Within the universe of excessive force cases where punitive damages are awarded, then the answer is no, Your Honor. And I think that's the relevant universe when engaging in not just the Gore analysis, but also the comparison to prior cases, which is a common part of the... I looked at your comparative cases. I could find no case that presented the constellation of misconduct in this case. Now, you're... Mr. Townsend, you're familiar with the record here, right? Yes, Your Honor. These officers came in in response to a call by this man. The record reflects that there was an unprovoked physical assault on them, right? That's what he testified to, Your Honor. The record reflects that he was injured as a consequence of this, right? That's right. The record reflects that he was in need of medical attention, but instead of getting medical attention, the officers took him to the station and handcuffed him to a chair, right? That... No, Your Honor. I disagree that the record reflects that. That is certainly plaintiff's intention. That was never conceded at trial, and that's not something that defendants would concede, and that's not something the jury was asked with regard to whether... All right. When the officers got to the station, each of them lied about what had occurred and participated in the preparation of false charging documents, correct? Again, Your Honor, that is plaintiff's argument. I would not agree that... Those were the allegations that the jury accepted in this case, right? I don't agree that the jury accepted those, Your Honor. The jury found that the... Did the officers participate in the preparation of false documents? The officer, your crew, participated in the creation of the arrest report. We would not concede... Did he participate in the preparation of false charging documents? No, Your Honor. We don't concede that the charging document was false. We understand the jury did not find that the officers met their were assaulted? That's right, Your Honor. That was their testimony, and that's what we heard. Is it your contention that that's true? That was the testimony given at the first trial. I understand that the liability verdict and the special interrogatories determined that that's not what the jury determined. That said, the jury did not determine that those officers lied or that they fabricated it. The jury simply found that the officers had not met their burden with regard to the special interrogatories forward. The jury was perfectly entitled to credit that testimony in fixing damages, right? I don't believe it was, Your Honor. And are you referring to the first or second jury? I guess my answer is the same either way. I do not believe that either jury would be for damages. Why? Because, Your Honor, it's a fundamental premise coming from the Supreme Court's case law on punitive damages, that punitive damages have to be based on not just what the defendant had notice of and the ability to present every defense about, but also the conduct that underlay liability. And as much as there was argument and testimony about whether these documents were false or not... Is it your testimony that since this was an excessive force case, the jury was obligated to disregard the testimony concerning the false documents? Not my testimony, Your Honor, just my argument. All right. Let me ask you this. Did Officer... Did Officer Uphoff, U-quit, I'm sorry if I'm mispronouncing it, perjured himself at trial? There was no finding that effect. The jury was not asked whether he had perjured himself. Does the record reflect that he perjured himself? All the record reflects is that the jury did not credit his testimony in the sense that the jury found that the special interrogatories were not proven. That man testified at trial that, quote, no one punched Thomas Jennings, unquote. Was that testimony true or false? The jury clearly found that someone punched Thomas... Was the testimony true or false? Based on the liability finding, that testimony was clearly... That testimony would have been considered... This court must consider that testimony incorrect. It does not mean that it was a perjured statement. It what? It does not mean it was perjury. Why wasn't it? Well, Your Honor... No one punched Thomas Jennings. The record reflects that is perjured testimony, right? No, Your Honor. Perjury doesn't require just a misstatement, but other elements, and there was no finding to that effect. I mean, I think the idea of holding against a defendant any statement made that later did not credit based on a liability finding would really set a standard that any defendant who testifies is then subject to penal damages based on presumed perjury. Okay, so after the police falsified the testimony... I'm sorry, falsified the arrest record, this guy was remanded to Rikers, right? He was in Rikers for several days, Your Honor. How long did he spend in jail? I believe it was perhaps a week and a half to two weeks. I can double-check, Your Honor. You said in your brief that he experienced garden-variety emotional damage. What is garden-variety emotional damage? Garden-variety emotional damage, as this court describes it, and as the district court describes, are damages that are testified to by the plaintiff, but do not have the further expert support, such as a psychiatrist testimony or something to that effect. It's his experience of being anxious, of being hurt, being confused. So his experience of having his son snatched out of his arms, having been beaten by police officers, having been subject to false charging documents, having been sent to jail, having been taken to the station rather than taken to the hospital. Are garden-variety in the cities of view? So now we're talking about the compensatory versus the punitive damages award, Your Honor. And certainly with regard to compensatory, I don't see how anything other than the act of excessive force to which the jury found liability could be considered part of the compensatory damages award. And there, Mr. Jennings just testified to feeling anxious, feeling hurt, feeling confused. And that is garden-variety under this court's precedent. Given the constellation of police misconduct in this case, tribes before a jury who get these kinds of things, why does the punitive damage shock the conscience? It shocks the conscience under the Gore analysis, the three guideposts, and by comparison to prior cases. And I would just say, Your Honor, the reason why both the district court and the appellate court review punitive damages awards carefully is because the courts are presumed to have a better comparative view of cases than just what the jury sees. The jury is familiar with one case. The jury is not familiar with the entire legal system or prior cases such as this court's prior precedent. Would you say that this is a good comparison? Compared to what they awarded, lower. And I think in this case, in the material respects, it's similar to cases where this court has remitted an award to a lower amount. When you say, Your Honor, the idea that there's a constellation of misconduct, there are cases in this court where there is a greater constellation of misconduct, but that's where a plaintiff brings multiple claims and the jury finds liability on multiple claims. And then all of that can be considered under punitive damages to justify punitive damages award. And that's not what happened here. May I interject for one second, Mr. Thompson, because I'm interested in our role as a court of appeals, the district court's role, and the jury's role. And you said, I think, rightly that the courts superintend the imposition by juries of the award by juries of punitive damages. But let me posit the following hypothetical that may get at what I think you're saying and an issue that I've got in my mind. Let's assume that instead of just a retrial, there were a number of different procedural other defects. There were several jury trials involving the same matter, four or five. And in each case, the jury awarded the same amount of punitive damages, let's say, $355,000 in each case. After the district court judge had in connection with the first trial said $355,000 sounds like too much. And there's a remitted. Would not in that hypothetical, just go with the hypothetical. Wouldn't the fact that four or five juries had separately arrived at the same punitive damages amount be significantly, almost controlling in our assessment of the propriety of the punitive damages award? In other words, isn't that evidence that the punitive damages award of this hypothetical $355,000 is probably right, probably reflects the reprehensibility of the conduct, the underlying conduct, and all the other factors? I would say the answer is no, Your Honor, because even all those juries are still seeing the same case or some variation of the same case, if in fact a plaintiff has altered his or her presentation of evidence between them. The key reason as Payne v. Jones, as this court described in Payne v. Jones, the key reason why the district and the circuit court need to review the punitive damages awards carefully is really a comparison to other cases and considering not just this case, but other cases. And that's where the jury... But I guess my hypothetical is meant to adjust that a little bit, right? So that is a way for us to figure out that oranges are compared to oranges and apples are compared to apples. But here in my hypothetical, we've got five different juries that are looking at the same set of facts. I'm not sure that I completely understand why that wouldn't be more powerful evidence of what the proper damages amounts should be. Because I think picking up on what Judge Menasche said at the beginning, punitive damages are approximations and they must be... They're never just tied to the facts of the case. They have to be considered in the entire legal system. And that's what this court was expressing in the Payne v. Jones decision. And I understand that, but it's some... I'm just... It was triggered by something you said, which was about the jury at some level. It's not a... We've got to defer at some level, both as a court of appeals and the district court. I'm just really asking you a question. It seems to me we've got to defer to this level of definite. So you admit, you acknowledge to the jury deliberations. Otherwise we would be in the business of determining punitive damages and we would take that away from juries. And so there... And here the presiding judge actually in connection with the second, the retrial, second trial on punitive damages or they came back with a roughly similar number and having heard the evidence in support of the plaintiff's claims here, Mr. Jennings' claims at both the original trial and the retrial on damages. And they came back and had the same effectively verdicts returned. That's evidence that it's not so shockingly high to the judicial conscience. Why is that wrong as a matter of law for the judge to have considered that fact in reassessing the earlier remittal? It's wrong, Your Honor, because if the prior order is law of the case, then what needs to be factored in is new evidence. And I don't think jury... Why is this not in one sense, I mean, evidence? Does it have to be admissible evidence or is it just evidence as in things are evident in our lives? And he says, I've seen the jury, I've seen the retrial and that is evidence that maybe I had it wrong the first time. I think it's much closer to admissible evidence, Your Honor. I mean, a jury... Where have we said that? On remitters specifically, Your Honor? Yes. So this court has not addressed the remitters status or the specific situation in terms of remitter. I think the Third Circuit and Borrero did address this point clearly. I think with regard to remitters, in this court, the Earl v. Beauchard transportation case, although it was not this exact second trial situation, did speak to, this is the principle, this is why remitters work this way. And they do signal to the plaintiff, this is the maximum amount that the court will allow a jury to return. Sorry, go ahead. No, no, you go ahead. So we have said in general, the law of the case isn't inviolate, right? And that courts can reconsider their own decisions. And really the key to departing is whether the party that gets the benefit or that is relying on the law of the case has the opportunity to prepare to make an persist, so there's no unfair surprise or something. But in this case, you had the opportunity to argue that the court should apply the remitted error limit from the first trial to the second trial, right? It wasn't like the district court departed in a surprising or unfair way, was it? Well, we certainly argued after the second trial that the remitter should be I'm just talking about the law of the case in general before we get to this particular thing. If the district court has reconsidered some earlier ruling and thinks maybe it got something wrong at an earlier stage, nothing prevents the district court from making that decision. And it seems to me that what we've said is that the district court isn't bound by it unless there's new evidence, it's just that the limitation is unfair surprise to the party relying on the law of the case. Why isn't that the governing principle? The governing principle, I think, is that the judge has to acknowledge, has to understand that it is law of the case and that it needs to identify a reason to depart. And here, and there are articulated reasons in this court's precedent, these are the reasons generally speaking why there's a departure. And the court here did not do that. The court didn't acknowledge the court. The court did give reasons. They said, yes, I made this earlier decision, but it was really an approximation. And now that I have a jury giving me a different number, even though it's not below the cap I had set before, it is closer to the mark. And so I think maybe I was too strict the first time. You're just saying that that wasn't, the court did give reasons, you're just saying that the reasons weren't sufficient because it really needs to be justified by a change in evidence and not just by the district court's own reconsideration. Two points, Your Honor. First answer is yes, but it's not actual evidence. And two, its description of those reasons, I think, are also independent legal errors. In that, on the one hand, it's violating Beauchard by saying, well, a jury verdict, a second jury verdict that's closer to what I thought was the maximum reasonable amount is sufficient. And on the other hand, that as I was trying to explain to Judge Williams... So would it have been different if the district court had just said, more expressly, I erred when I said the first time that this was the maximum reasonable amount. And having given it more consideration, I think this other number is the maximum reasonable amount and the jury verdict is below it. And maybe you disagree with the determination on the merits, but that wouldn't be a violation of the law of the case, would it be? I think you're right, Your Honor. I think that if the court had said I erred and here's why the other amount is correct, I think it's a different case. And certainly we would be presenting different arguments on appeal. Okay. I have one final question. Is it your position, Mr. Townsend, that the amount of award fixed in the first trial as a matter of law kept what the second jury could return? The answer is yes, unless the plaintiff could present different evidence that goes to those awards that justify the higher number. Was the judge... Let's assume hypothetically you would ask the judge for a charge or the city had asked the judge for an instruction to the jury that they could not have... They were barred from returning an award in trial two that exceeded their award in trial one. Would that have been lawful? But the jury could not return an award that exceeded the reward given in trial one. Yeah. I could clarify, Your Honor. I don't think that would... I think what you're referring to is the remittance amounts determined after trial one, not the verdict. I'm sorry. I don't know that that would be categorically unlawful. I know this court disfavors using specific numbers and jury instructions around damages. So I would have to think more about whether this is a permissible instance of using that instruction when generally speaking, that's not appropriate. If the award in trial two had saved in $1,000 more than trial one, would that, in your view, still be an award that has to be set aside? $1,000 more than the amounts determined? Yeah. So $141,000 as opposed to $140,000? As a matter of law, I think the argument would be yes. Obviously, we could factor that into the strategic decisions we'd make about whether to appeal. As a practical matter, perhaps that would have an influence, but I think as a matter of law- That's a legal matter. In your view, unlawful award? Correct, Your Honor. As a legal matter, once the court's determined this is the maximum amount for this behavior that is reasonable, that is the amount barring some justification for a departure that is a valid justification for departure. How could that be consistent with the Seventh Amendment? In two ways, Your Honor. First, remittances are long established and compatible with the Seventh Amendment. The Seventh Amendment says that a jury's determinations cannot be reexamined other than under the common law, and the Supreme Court has long held that under the common law, remittances are appropriate. But additionally, Your Honor- But under the common law, could the judge in trial two have instructed the jury that any damage award they were inclined to return would be capped by the remitter in trial one? I'm not familiar with whether at the common law, an instruction of a specific amount was appropriate. But either way, there's a second reason why this is compatible with the Seventh Amendment with regard to punitive specifically, which is that the Supreme Court has specifically said that punitive damages awards are not facts that are found, and so review thereof does not implicate the Seventh Amendment, and that's in the Cooperman Industries case. So I don't think the Seventh Amendment really comes into play here, and I think that's already been addressed by just so that I'm clear. If we were to agree with you, then the city's view is that we would be required to reimpose the $140,000 remittal amount. Is that correct? If the panel agrees with me on the second argument concerning the law of the case, I think the answer is yes. If the panel agrees with me on the first argument, which is that almost leaving aside the first remitter decision and just reviewing the verdict as it was awarded, it's inconsistent with the Gore guidelines and inconsistent with this prior court's decision, then in that case, this panel could identify a different remitter amount than exactly what was specified in the first one. Low, but when you say different, is that lower than the $355,000 or lower than the $140,000, or somewhere in between? What is it? I see what you mean, Your Honor. If the panel agrees with me on the law of the case and the validity of the first remitted order, $140,000. That's $140,000. I'm trying to understand your answer to just Parker's questions. What if we agree with you on the Gore-related argument? I see, Your Honor. If the panel disagrees with me about law of the case, disagrees about the status of the first remitted order, we say this panel tosses that out. At that point, it's just looking at the $355,000 and answering under the Gore guidepost and the comparison to prior decisions is $355,000 too large. At that point, the panel would have to come up with its own decision about what amount under $355,000 is appropriate for a new remitter. Is that, and this is literally just, I'm asking a question. Is that something that we could then rename back to the presiding judge, or is that something that we ought to do? In terms of identifying the specific amounts, Your Honor? Yeah. Typically, this panel, not this panel, this court does identify the specific amounts. Yeah, yeah. And that you see that in Payne and DeSorbo. I believe it's probably within this court's discretion to remand with instructions for the district court to determine a different amount. I would say the one practical reality of that is that I believe Judge Gold, who presided over both trials, has now left the bench. And so in that instance, the district court judge that receives a remand would really be in no better position than this panel, because that district court judge- Do you know who referred it to Judge Gold offhand? I'd have to double check, Your Honor. Okay, okay. No worries. I can't answer that. It'll take me a second here. No, no, no. That's fine. That's fine. And then just one more question. If there was, well, there will be presumably some punitive damages award, who pays that? Okay. So just to be clear first, there's no information about indemnification or ability to pay presented at the trial. That's not something that's factored in, and that's not in the record. All right. With that caveat, who pays that? With that caveat in mind, the city makes an indemnification decision based at the end of a proceeding, taking into account what happens on appeal. The defense decision is obviously made at the outset, but the indemnification of any adverse judgment is a decision made at the termination. And that would include punitive damages? I think that's something that would have to be considered once the entire verdict. As a matter of policy, does the city indemnify punitive damages? I am not aware of any policy one way or the other, Your Honor. Do you know of any instance in which, or put a policy aside when the city's picked up punitive damages? I am not aware, Your Honor. One way or the other, or you're not aware that the city has ever picked up punitive damages? I'm just not aware of one way or the other, Your Honor. Thank you. We've kept you well past your time, but that was entirely in answer to our question. So we'll hear from Mr. Kornbaum, and then you reserve three minutes for rebuttal. Mr. Kornbaum. Good morning, Your Honor. Scott Kornbaum for Mr. Jennings, and on the line with me is Michael Loomer, who was co-counsel at trial. Let me start off. You've heard our questions and our concerns. Yes, and let me start off with the issue of indemnification. I am informed by Mr. Loomer that the city has posted a $500,000 bond to prevent Mr. Jennings from starting collection efforts, and the posting's on the court docket sheet. I can also say that in the past, the city is on record as, and this Judge Shinran, this is a long time ago, I think about 2010 in a case called Giyazi versus the City of New York, G-Y-A-S-I. The city acknowledged that it had a practice of indemnification. How, if at all, that has changed, I do not know. That's for punitive damages as well as compensatory damages? That's correct, Judge Parker. So what struck me about the officer's argument is that it violates the basic canon of this court's review, which is it does not view the evidence in a light most favorable to Mr. Jennings. Judge Parker, you made reference to whether the jury found that the officer's testimony was perjurious. It was. The jury ignores, in light of the jury's specific findings, that they rejected the officer's testimony that Mr. Jennings had struck your cue and had attempted to flee. In the face of those factual findings that the city, that the defendants, the officers begged for, there's no escaping that the jury believed that the officers had committed perjury. And it wasn't just the jurors who did so, following the of the joint appendix, Judge Gold, after the jury's verdict, asked, he goes, he says to lawyers, can you help me here? He says, I don't know whether the sustaining of a punitive damages award can take into account the jury's conclusion that the officers were untruthful or whether at trial or whether a punitive damages award has to be based upon the evaluation of the conduct that was tried. So Judge Gold thought the jurors found that the officers had committed perjury and Judge Gold thought that the officers had committed perjury in the, in the wake of the, of the special interrogatories and the jury's verdict. I want to address first and foremost, this notion of the law of the case. And as I believe Judge Menasci pointed out and, and, and others, it is a discretionary doctrine that this court has repeatedly indicated, noted that, and I quote, the law of the case doctrines quote, is discretionary and does not limit a court's power to reconsider its own decisions prior to final judgment. And I was quoting from Arimony versus United Way of America, 254 Fed Third 403 at 410. And if one thinks about and reflect, it makes sense. Judge Gold sat, as he noted in his second opinion, Jennings too, heard the jury speak twice. He heard the evidence. He knew what the evidence was at the first trial. He knew what the officers had done to Mr. Jennings. He knew how they had covered up, effort to cover up their unconsciousness. But isn't the evidence the same? Like, isn't the evidence at the first trial the same as at the second trial? So there isn't really any new evidence that he's looking at. So what is the justification for him? Well, I think if it was, if it was a reasonable cap at the first trial, based on all the evidence you saw, and he saw the same evidence at the second trial, why all of a sudden is it not a reasonable cap? Well, I'll get to the, the evidence in one second, but he obviously believed that the first decision, his first decision was not reasonable. And as I believe your honor pointed out, he can do that. Judges can do that. So here's the difference in the evidence. In certain respects, it, the evidence is stronger against your cue and it's stronger in certain respects against Solomito and LeGrandier and weaker in certain respects. So let me start with your cue. The biggest difference in the testimony is that the jury heard, saw and heard evidence of the coverup, the framing. And we know that weighed heavily on the jury, or we can presume that that weighed heavily on the jury's mind in the second trial, because during jury deliberations, and this is in the special, the supplemental appendix, the jury sent out a note, which was courts exhibit four, which is at page four of the supplemental appendix. And they asked for the mugshot, obviously that's going to compensatory damages and the arrest report. The arrest report in the first trial was not introduced into evidence. Council used it to impeach your accused testimony about whether Jennings had run. Because as you see in the arrest report, which we had next, which is part of the supplemental appendix, there's no reference to the running. At the second trial, though, this arrest report, as counsel made tremendous use of it, showed that the story was a lie. There was no evidence of running. The evidence was stronger in the second trial because the jury actually came in with a lower number in the second trial. The person who changed was the judge. Well, let me hear. So did the judge say that this evidence has led him to reconsider what he thought was a reasonable cap on damages? There's some reading, but candidly, it is. So what Judge Gold says, and he says, I sat through two trials and I saw the jury deliberate twice. I presume the jury deliberated in good faith on both occasions. And I think the jury got it right the second time. Here's another thing that was missing from the second trial, which I think, while not discussed in Jennings too, but I think it's something that influenced the judge, which is what was, because it was a damages only trial, Judge Menasche, one of the things that inflamed the jury in the first trial, one can, and bear with me, this is a little bit of guesswork on my part, is the prejurious testimony in the sense. So we often see, some people believe that runaway verdicts, extraordinarily high verdicts are explained because jurors hold the defendants or the plaintiffs, but in civil litigation, but in police misconduct litigation, sort of in contempt. And I don't mean contempt legally, but just, they are just so turned off by the bogus prejurious testimony that numbers tend to go up. So Judge Gold, that was absent from the second trial because there was no testimony about liability. There was no testimony other than from Mr. Jennings about how he had not fled, how he had not run. And let's bear in mind that the jury knew in the second trial, knew that the first trial for the first jury in the first trial had rejected the officer's testimony. So Judge Gold has now had the benefit of two verdicts, one with the prejurious testimony, and then with a cleaner verdict, a cleaner trial, because the prejurious testimony was stripped away and he could say, hey, now two juries hearing the same evidence of the same or similar evidence of the officer's misconduct came to a number and I got it wrong. Where the evidence was, and so the evidence of the coverup slash framing, and let's not, let's, no bones about it. They tried to frame Mr. Jennings for the crime of assault. That was egregious where it was. And so that wasn't as, that wasn't in the first trial to such an extent as it was in the second trial, where the evidence was a bit weaker was with respect to Solimito and LeGrandier, because in the first trial, they testified about how they went to the hospital and attributed injuries to Mr. Jennings, which the jury rejected. While that testimony was in the second trial and the first trial with respect to your cue, it wasn't present in the second trial with respect to Solimito and LeGrandier. I guess, I mean, so do you, so since you're referring to the second trial as, as clear, I take it you don't disagree that the damages awards were too high in the first trial? The original jury awards? Yeah. Is that your question, Jess, the original jury awards? Yeah. We acknowledge that remitted. Okay. So then what's your, so then what's your view of the appropriate ranges? If you think that the one that the judge came up with is, is, was too low? I think the second jury, jury got it right. And judge, magistrate judge gold got it right. And here in particular is why $10,000 for LeGrandier and Solimito in the first trial is shockingly low. That shocks the conscience because, and where judge gold got, got it wrong. And where the city, the officers get it wrong. And we heard this from the snapshots. So, okay. They used force. That's it. But I think as judge Parker's questions made clear, there is, uh, uh, the officer's content was unusually reprehensible. I believe that. And there was a constellation of misconduct, even if the officers are usually, do you disagree that $355,000 is above other similar cases where we have unproposed violence that resulted in serious, but not permanent damages damage? I mean, this is a, this would be an outlier case. And you're saying that's justified because of the nature of the conduct. I would, I would, looking at this court, meaning not district courts in the second circuit, but this court, uh, I, I think that the damages award against your queue exceed what this court has approved, uh, but not Solimito or LeGrandier. Let's be clear. The punitive damages award has to run to each officer. And so yes, 255, I'm sorry, 250, as it concerns your queue is higher than this court, um, has permitted, but the other decisions, this, this, let's just focus on that. So that is out of the range of past decisions. And as an outlier, I'm sorry, but this case does present evidence. That's a case like pain does not, right? This case has the cover up. This case has the framing, right? I mean, just think for a moment, these officers went to the hospital, your queue took a photograph of non-existent injuries. And he, and he, he did so knowing that the VA would rely upon that. That is malice. That is evil. But, but so this is different than just an officer beating up somebody. And then again, the other cases don't involve, uh, they're usually against one, usually against one officer, but you have Solimito and LeGrandier, those numbers are well within the permissible range, but I'm sorry, Judge Menashe, you had a question. No, I think you, I think you answered it. So you would say that, that you, acknowledge that the award against your queue is, um, exceeds what's been awarded in other cases in the general description of unprovoked violence that resulted in serious, but not permanent injuries. But you're saying it's justified because of the cover-up aspects to his conduct. The additional misconduct. And I will say though, that district courts have upheld awards of similar or the same amount. For example, in our 28J letter, we bring to the Osborne, which was decided October 20th of 2020, which obviously none of the parties or magistrate judge gold had available to them. And judge Brissetti in a, in a, in the prison setting upheld an award of excessive force against a correctional officer, a sergeant in the amount of $275,000 and against two correctional officers for $125,000 and $50,000 against correctional officers, Snedeker, who was for all intents and purposes, similarly situated to LeGrandier and Solomito because he joined in the use of force instead of trying to stop it and then engaged in a cover-up, which is exactly what they did in the first trial. Um, and in the second trial as well, although the evidence was at, was not as pronounced in the second trial with respect to that, this court cannot take into account, um, other conduct. Now they say it's the use of force and that's it. That, that, that makes no sense whatsoever. First of all, they don't cite any case letters, any case letters support that argument. There are references to the Supreme Court's decisions. And I think it's, um, uh, the, the cigarette case, I'm sorry, I'm drawing the blank and another, and the all state decision, those cases, what they're talking about is you can't bring in prior misconduct that may have occurred to parties who were to individuals who are, who are foreigners to the litigations. And let's, let's, let's be clear that the cover-up conduct is part and parcel of their use of force. They engage in this cover-up and framing so that they wouldn't get caught so that they could get away with their mis, with their misconduct. And, it occurred within, we don't know exactly. I think you said a moment ago, uh, I just, I'm not recalling it right now. So the, the evidence of going to the hospital was in the first trial or the second trial or both? Uh, for your cue, it was in both trials. First, Olamide and LeGrandier was in the first trial. Okay. That, so what, oh, my pleasure. So the other, one thing that strikes me about this discussion of law of the case and, um, and, and retrials is the sense, um, oh, I, some, uh, some, before I forget, I think it was Judge Loewe, though it may have been Judge Parker who asked who was, who referred the case? It was Judge Towns. And when Judge Towns got sick, the parties decided to proceed before Magistrate Judge Gold. Um, this idea that, uh, you can just, um, that, that, that why have a retrial? If damages are going to be capped, why have a retrial? I mean, just think about it from the plaintiff's perspective. It'd be, you know, have to, if you would never opt for a new trial, you have your, you have your evidence. Hopefully you've presented it as well as one could be at the first trial. If you know that $140,000 in punitive damages, and I believe it was $115,000 in compensatory damages, uh, was the cap, you would, you would, you would just endlessly retry. Well, I think the opposing counsel had said just a moment ago that the evidence could vary, and you're acknowledging that the evidence put before the jury is, the presentation you make to the jury varies from trial to trial. And so maybe there might be a reason for varying the number. Um, but that wouldn't undermine the idea that in the absence of new evidence, maybe the number should be the same. Um, I don't think that's corrected because, but in, because in my hypothetical, the evidence was as high as it could be. I mean, I'm sorry, the evidence that the plaintiff put on as good a case as he or she could have presented to the jury. And so it makes no sense that, um, you would just go in this endless loop. And I want to return, uh, to a case that we cite in which Mr. Townsend mentioned. It's a case called Lassonde versus on remand from the third circuit. And, uh, and I'm just going to quote from it. And it's, um, I think it was a false arrest and malicious or malicious prosecution case against the city of Newark. I believe this court previously found that quote, the $2.7 million award was so grossly excessive as to shock the judicial conscience. And there by remitted that amount to $750,000. If $2.7 million was quote, so grossly excessive end quote $4 million, which is the new jury verdict is now grossly excessive. Nevertheless, the second and the first jury verdicts reflect how seriously two juries treated the injuries inflicted on Ms. Mrs. Lassonde. It causes this court to consider whether it may have undervalued the psychological injuries when it had established an appropriate remitted or figure on the first remitted or emotion. The court concludes that it did undervalue these injuries and that the $4 million award should be remitted to $1,250,000. Now judge Debevoise was referring to compensatory damages, but the principle is the same judges. How could it be that a judge cannot reflect on his or her own decision prior to fire prior to final judgment, of course, and then say, you know, I've got it wrong. And if I think I got it wrong, why can't I change my mind? And that's what happened. Um, again, on the issue of whether, uh, you know, I want to, unless, unless the court has questions, I want to, I have some questions. Did I, I may be confused, but I read in the record that after the judgment, in this case, one of these offices was promoted. Uh, I don't know the answer to that. Uh, maybe Mr. Loomer does. Uh, and he, he can contact me. Um, so I don't know the answer to that. Just Parker. And it's certainly not on the record. It's not in the record, but I want, I thought I'd seen something like that. I could have been mistaken. I want to leave the court with this idea. You know, let's not also not forget that this misconduct really is it's Regis conduct occurred in the presence of Mr. Jennings, three-year-old child. What more, what more lack of, uh, of, uh, what is, what is the, what is the underlying conduct that we are supposed to, uh, the reprehensibility of which we're supposed to assess? Is it the conduct involving the excessive force or, I mean, you're asking us to, um, I think, uh, expand the frame a little bit, uh, um, so that we consider that the son was there. We consider what happened after he was dragged out and, you know, at the hospital and so on. What, what is the conduct that we're, we're supposed to determine? It's the officers. I'm sorry, judge. It's the officer's force and the circumstances of which arose thoroughly unprovoked in the presence of his three-year-old son. No justification whatsoever to additional officers instead of saying, let's assume for the moment that, uh, so, but, but can I stop you there for a second? Sure. In connection with when you answered, I think just actually actually both, both of my colleagues, um, uh, you, you pointed to the fact that, uh, uh, your cow, I don't know if I'm pronouncing that correctly. Um, and the others, uh, after engaging in excessive use of force, uh, engage in other reprehensible conduct, but that's, that's not part of the use of force. No, may I? Yeah. Uh, but it's in, but it's part and a terrible message to try. You can't separate the wheat from the chaff there. It is, it is to use the city's expression, part and parcel of the misconduct. And so, uh, and when you reflect upon, let's just focus on LeGrande and Solomito for a moment. If, if one thinks about, okay, let's assume that they couldn't intervene and stop the two blows, giving them all the benefit of doubt, which this court cannot do given the procedural posture, instead of stopping, instead of saying, oh, you're cute, kill, take a step back. They join in. They then knowing that they have, of course, that's the use of force, but no, I understand, but go ahead. No, I, but then they continue to say, oh, we screwed up. We screwed up big time. We have to cover our tracks. How can that not, that is, that is part of the, the, they're trying to hide their misconduct. And that just, sorry. And my, my question is, have we, where have we focused on that in part? That is the conduct after the excessive use of force in trying to determine under Gore, you know, in connection with reviewing other comparable cases, what the appropriate punitive damages award is. Where have we said that? Candidly, I do not recall a decision. Yeah, neither do I. I will say though, Judge Brissetti and Anderson absolutely thought it was warranted. Sure, but where have we said this? I do, I cannot think, I don't recall seeing a decision. I do know that in Lee, it was, it was a malicious prosecution claim, which is similar, but not the same. And I don't remember this. I am unfamiliar with the case. I'm not suggesting that it's inappropriate, but I believe that you're asking us in pointing to the conduct at the hospital, so breaking ground in at least when we get to the comparable cases part. Well, I'm sorry. I don't think it's, I'm just looking for something. I know that courts have, other courts have looked at misconduct efforts to cover up, you know, at pages 35 and 36 of our opening brief, we say the seventh circuit, the 11th circuit, a district, Western district of Tennessee case where the courts absolutely find evidence of a cover-up relevant to the assessment of the amount of punitive damages. But we have never said that. I'm agreeing with you, Judge. I believe that's correct. I don't recall. Hopefully someone will remind me and then I'll write a 28-J letter, but I think I would have come across, I hope I would have come across that. Your fifth 28-J letter, okay. Judge Parker or Judge Menasseh? Okay. And nothing further from you, Mr. Kornbaum? No, I just, no, I think I've said most, I mean, but I do wish to refocus the court on really the heinousness of their conduct. It really was on the scale of punitive damages and the scale of police misconduct. This is up there, right? This is really, really egregious. Thank you. Thank you. Mr. Thompson? So thank you, Your Honor. Thank you, Judge Lothier. Starting with your question regarding when, if ever, this court has taken into account other events, using plaintiff's language, additional egregious behavior that was not charged or bound by the jury, I also have not been able to find such a case. And I think the court really did the opposite in Levy-Edwards. To recap briefly, in Levy-Edwards, there were jury findings that the defendant officer had both assaulted the plaintiff as well as then committed malicious prosecution. And in fact, the jury had found that he was, that the plaintiff was entitled to punitive damages as to both. For strategic reasons, the plaintiff only sought punitive damages on the malicious prosecution claim. So when it came time to evaluate whether that punitive damages award met the Gore factors, this court confined itself explicitly to just the malicious prosecution. And that's, I think, consistent with the State Farm Insurance case, where the Supreme Court has said, it has to be the conduct that underlay liability. And I would just add also, in the Smith v. Wade case, the Supreme Court has made clear that punitive damages are never automatic, even if the behavior is egregious. So even stipulating, even if you could assume that a jury would have found that the officers committed other constitutional torts, that still doesn't give you ground to then assume that a punitive damages award would have followed for each of those torts. Where there has been a consolation of misbehavior, to use Mr. Jennings' counsel's language, where there has been a consolation of misbehavior, plaintiffs bring multiple claims. Plaintiff was entitled to bring a denial-of-fair-trial claim, which is a claim that this court has recognized covers things such as fabrication of evidence. If the claim is cover-up, if the claim is framing, then he could have fled that claim, he could have brought that claim to trial. And then the situation would be very different when the court is evaluating what the appropriate damages award would be for both that claim as well as an excessive force claim. Uh, just to touch briefly on the change in evidence, Your Honors. Sorry, is it your position, Mr. Townsend, that the evidence of falsifying, of filing this false report against this man was irrelevant? Yes, Your Honor. Certainly with regard to the punitive damages to be awarded, it was irrelevant. And what do you say, I'm not sure that I'm familiar with the Seventh Circuit or Sixth Circuit cases on this issue. In fact, I can affirmably say I'm not familiar with them, but what do you say in answer to the fact that you're familiar with them, to Mr. Clombrow's argument that circuits have recognized that post-use-of-force conduct may be a basis for assessing the punitive damages award? I believe the circuit decision cited to there are actually employment discrimination cases. And I believe in those cases, at least the Seventh Circuit cases that I remember from Mr. Clombrow's brief, those cases are discussing whether plaintiff has met the certain additional prerequisites that are required to achieve punitive damages in an employment discrimination case against an employer, a failure to show good faith compliance with anti-discrimination policies and other things like that. So there are these additional requirements that in that instance, a alleged cover-up was relevant to. Mr. Townsend, if one of the main purposes of punitive damages is to deter police misconduct, why shouldn't juries be given a complete picture? How can they properly assess deterrence if they only partially understood what these people did? They can receive a complete picture, Your Honor, where the plaintiff says, these are all the things that were violations of my rights and pleads that and takes those to trial. And so the plaintiff and the defendant can put on complete cases for a denial of fair trial claim, a denial of medical care claim, or similar claim. And in that instance, the jury has been asked, do you find liability for each of these things? And do you find, if so, do each of these things entitle a plaintiff to punitive damages? And that's- Why isn't all this perfectly relevant to a test of force case and a malicious prosecution case? If, Your Honor, if plaintiff had retained his malicious prosecution claim and took that to trial, I think it would have been relevant. But he chose not to do that. He chose to withdraw his malicious prosecution claim. And therefore- So your position, I think your position would be, if the judge is looking at the award of damages and the award seems reasonable only in light of extra uncharged conduct that's not part of underlying liability, the judge is required to do a remitter to bring it down to a reasonable range, just taking into account the convicted conduct, right? The conduct for which the jury found someone liable. The jury imposed liability. Right. Yeah. Right. That is my position. Yes, Your Honor. And it could- But it's a little odd, right? Because if the judge were imposing the sentence, the judge could take into account that conduct, right? So why- Yeah. Well- Oh, I see. Yeah, okay. I mean, the Supreme Court has cautioned us against making too literal a comparison between criminal and civil in the case of punitive damages. And I don't think this is an appropriate circumstance to then take the sentencing guidelines and what the court can do there into civil liability here for punitive damages. I do want to address just one thing on the difference in trials. Mr. Korenbaum identified that the arrest report was admitted as substantive evidence in the second trial and not the first. That may be true, but in the first trial, the officer who prepared the paperwork, who is not a defendant, testified. And she testified that she received information from Officer Yerkew. So the evidence, as the district court itself recognized, was the same or similar. It just why did the... I'm sorry to belabor this point, but I'm just trying to think this through. If it is true that the hospital, conduct in the hospital and so on, post-use of force conduct, is irrelevant in your view to the punitive damages award, and if it's also true that the second retrial was about that damages award largely, why did the city object to any post-use of force evidence? Yes, Your Honor. The city objected. I mean, the plaintiff's counsel asked Officer Yerkew, for example, point blank, you know, you framed my client, didn't you? And the city objected. You didn't give him medical care when you knew you should have, right? I mean, the city objected to all those things. Obviously, unsuccessfully, but okay. In some instances, the district court initially sustained the objection and then the council approached it a different way, but largely unsuccessful, Your Honor. And the citations for the objections with regard to the fabrication questions, for example, are at, I apologize, Your Honor, A-1674-76, where the plaintiff's counsel is asking Officer Yerkew very directly, and the city is unsuccessfully objecting each time. A similar pattern with regard to the denial of medical care assertion, that's at A-715-19, and it continues on 1725-27. So, the city did object, Your Honor. Judge Parker or Judge Manasseh, any further questions? No. No, that's all. Thank you, Your Honor. We just asked for a minute around this case. Thank you very much. The matter is submitted. Go with the decisions. And that concludes today's oral argument calendar. I'll ask the court, the clerk, to adjourn court. Thank you. Court is adjourned.